LUKAS ZAHARYAS, Appellee, v. THE CHICAGO, ROCK ISLAND
& PACIFIC RAILWAY COMPANY, Appellant.

Compromise and settlement: FRAUD: EVIDENCE. In this action to
abate as a nuisance the diversion of surface water in such manner
as to wash dirt from an embankment and cause it to spread over
plaintiff's land, to which defendant pleaded a settlement of all
damages accruing, and plaintiff contended that his signature to
the written settlement was obtained by fraud, the evidence is re-
viewed and held insufficient to show fraud.

Same: FRAUD: UNREASONABLENESS OF SETTLEMENT. Where it ap-
peared that plaintiff's land consisting of twenty-four acres was of
the value of $60.00 per acre, two acres of which was covered with
clay washed by heavy rains from defendant's embankment, and
that the amount of land thus covered at the time of the claimed
settlement for damage thus caused was the same as at the com-
mencement of this action, a prior settlement with plaintiff for all
damages, past, present and prospective, in the sum of $250.00 was
not so unreasonable as to constitute a circumstance in support of
the claim of fraud in procuring the settlement.

*Appeal from Jefferson District Court.*—HON. C. W. VER-
MILION, Judge.

SATURDAY, FEBRUARY 14, 1914.

ACTION at law to abate a nuisance; the nuisance consist-
ing in the diversion of surface water. There was a verdict
for the plaintiff and a judgment and order of abatement en-
tered thereon. The defendant appeals.—*Reversed.*

*F. W. Sargent, J. H. Johnson,* and *J. P. Starr,* for ap-
pellant.

*A. G. Jordan* and *E. F. Simmons,* for appellee.

EVANS, J.—The plaintiff is and was the owner of twenty-four acres of land, being a part of a government subdivision of forty acres. This forty-acre tract is traversed by two rights of way of the defendant railway company, known in the record as the "old" right of way and the "new" right of way. The old right of way traverses the forty-acre tract diagonally in a northwesterly and southeasterly direction. The new right of way traverses the same diagonally in a north-easterly and southwesterly direction. Between these two rights of way, and south of the point of intersection, lies the plaintiff's twenty-four-acre tract, triangular in shape. That is to say, its base line rests upon the south line of the forty-acre subdivision; the tract extending north and coming to an apex at the point of intersection of the two rights of way. Walnut creek runs easterly through plaintiff's tract, dividing it into approximately equal parts. The defendant railway company acquired its new right of way in 1900 and constructed its roadbed thereon, in the form of a high embankment, in 1901 and 1902. After the acquisition of its right of way by the defendant, the plaintiff in 1901 purchased his twenty-four-acre tract. The plaintiff's land is low and flat and is subject to overflow from Walnut creek in times of heavy rain. The embankment of the defendant is fifty feet high at Walnut creek and diminishes in height as it extends to the high ground in either direction. The embankment consists of sand, gravel, cinders, and clay. At the time of its construction, its base extended to the full width of the right of way. After its construction, it settled and slipped more or less, and the rains carried clay from its sides to its base and upon the contiguous land of the plaintiff. The plaintiff commenced this action December 2, 1911. He claimed damages for washings and overflow from the defendant's embankment for the years 1907, 1908, 1909, 1910, and 1911, and prayed for an abatement of the nuisance. The defendant pleaded a general denial, and pleaded further a full settlement and satisfaction between plaintiff and defendant on Decem-

ber 11, 1906; the settlement being in writing. The plaintiff
in reply pleaded that his signature to the written settlement'
pleaded by the defendant was obtained by false and fraud-
ulent representations as to its contents, and that the plaintiff
was deceived thereby; he being unable to read or write the
English language. The trial court instructed the jury that
the written settlement in question was a complete bar to
plaintiff's action, unless the allegations of fraud in its obtain-
ing were sustained. There was a verdict for the plaintiff for
$48 and an order abating the nuisance and enjoining the
defendant from permitting water from its right of way to
run upon the plaintiff's land.

The principal question presented to us is whether there
was sufficient evidence of fraud in the making of the settle-
ment with plaintiff to sustain the verdict of
the jury in that regard. The claim is that,
being himself unable to read the English lan-
guage, he was deceived by the defendant's agents as to the
contents of the contract of settlement.

1. COMPROMISE
AND SETTLE-
MENT: fraud:
evidence.

· The plaintiff was born in Germany. His native language
is Polish. He came to this country at the age of twenty-two,
and has lived in his present neighborhood for thirty years.
He has bought and sold land to some extent. He is a farmer,
and for more than twenty years has owned his farm and has
transacted all the business incident to its management. His
examination as a witness discloses that he speaks English
readily, though not perfectly, in a grammatical sense. In
the settlement of December 11, 1906, the defendant was repre-
sented by one Mulligan. In order to impart an intelligent
understanding of the evidence in relation thereto, a little
previous history must be stated.

In May, 1906, one Palmer had represented the defendant
in negotiations with the plaintiff looking to a settlement of
all claims made by him at that time. Palmer being without
authority to promise any ditches, the following written pro-
posal was signed by the plaintiff and taken by Palmer:

$180.00.  16th day of May, 1906.  Ditches.  This certifies that if the Chicago, Rock Island & Pacific Railway Co. will pay me by voucher through the post office at Pleasant Plain, Ia., R. R. No. 1, within a reasonable time the sum of one hundred and eighty and 00/100 I hereby agree to accept the said sum in full settlement and satisfaction of all claims, of whatever kind and description, arising from or growing out of all damages by reason of damages by overflow and damage to my land by rails, ties and débris, railroad to put in a ditch on its right of way both sides of Walnut creek.  This agreement subject to approval by the claims attorney or claim agent of said company.  Lukas Zaharyas.

In presence of Adam Peck, Jas. S. Palmer.

At the time of the construction of the embankment, a side track had been laid by the construction company on the land of the plaintiff by arrangement with him, and considerable débris had been thrown and left upon the plaintiff's ground as an incident to the use of such side track.  This will explain some of the terms of the above proposal.  Subsequent to May 16th considerable correspondence was had on the subject between the defendant and the plaintiff's attorney.  On December 11th Mulligan came to the home of the plaintiff and effected a settlement for the sum of $250 as damages and the further sum of $50 as the purchase price of fifteen-foot strip of land abutting on the right of way.  Two instruments were drawn, one purporting to convey the fifteen-foot strip and the other purporting to be full settlement of all claims for damages, "past, present, and prospective of whatever kind," sustained by reason of the embankment referred to and sustained by reason of the overflow on plaintiff's land.  For want of access to a notary public, these papers were not signed on that day.  Mulligan was unable to remain until the next day.  He therefore paid the plaintiff the full sum of $300 with the understanding that the plaintiff and his wife would go to Brighton on the following day and execute and acknowledge the papers before a notary public.  Mulligan left the papers with the plaintiff or with one Case and departed.

On the following day the plaintiff and his wife went to Brighton and in company with Case appeared before Ed Deeds, a notary public, and there duly executed and acknowledged both instruments. Shortly thereafter both were duly filed.

On the question of fraud, the following is the testimony of the plaintiff as to what was done by Mulligan:

When I signed the two instruments, Exhibit D2 and Exhibit D3, a railroad agent came from Chicago to my house. That was in 1906, in December some time. Q. Now what did he say to you when he came down there to your house at that time? A. He says he came down to pay me that damage what I settled up with Palmer and that $50 for the switch, and says, says he, I got to sign a receipt for that what he pay me. Q. Did he say anything else? A. He says he wants a fifteen-foot strip to cut a ditch. Q. What else did he say? A. He want me, hire me to cut the ditch. Q. Did you tell him what you wanted for that fifteen-foot strip? A. Yes, sir. Q. How much did you tell him? A. I told him a hundred dollars. Q. What did he say to that? A. He says too much. Q. What did you say? A. I says that ain't too much, cut the line, the line been straight, and he buy a piece and cut up and spoil the line, the fence line. Q. And do you remember what he said relative to how much money he would pay you? A. Well, he didn't say how much, but $180 and $50 for the switch, and he buy more land. Q. What was he to pay you altogether? A. $300. Q. What else did he say? A. He don't want to pay me a hundred dollars for that fifteen-foot strip. Q. What else did he say? A. After he buy that he says he going to cut the ditch. He want to hire me to cut the ditch. He told me to see Mr. Case, and get him to cut the ditch. Mr. Case was superintendent of the cut-off. Some called him an engineer. Q. What else did he say about signing these papers? A. Well, he says we go to Pleasant Plain. Q. What did he say those papers were, if anything? A. He says—what for, to sign? Q. What was the receipt for? A. To pay for the damage and that $50. Q. What did he say about Mr. Palmer? A. He said he was going to pay that damage I settled up with Palmer.

After the negotiations had been concluded with the plaintiff on December 11th, one Frank Pacha, a mortgagee of plaintiff's land, signed a mortgage release of the fifteen-foot strip of his land. In that connection plaintiff testified as follows:

Q. Did you ask Mr. Pacha—can Mr. Pacha talk Polish? A. Yes. Q. Did you ask him any question in Polish? A. After we came out of the post office I ask him if he pay me this damage to this time. Q. Who did you ask that question to? A. I asked it to Mr. Pacha. Q. What did you ask Mr. Pacha, then, after you went out of the post office there to ask this man that had these instruments? A. I asked him, that man, pay me that damage to this time. Q. Did Mr. Pacha ask him that in English? A. I ask Polish and he talk English to the other man. Q. To the man that had these instruments 2 and 3? A. Yes, sir. Q. What did that man say? A. He says, 'Yes.'

The foregoing excerpts constitute the entire testimony as to the alleged false representations by Mulligan. We think this testimony wholly fails to sustain the charge and furnishes no basis for the verdict of the jury in that regard. Mulligan was there professedly in the interest of the defendant. It does not appear that any statement made by him was false in fact, nor does it appear that there was any artifice resorted to by him, nor does it appear that he knew plaintiff's inability to read the English language. As to the postoffice incident with Pacha, it is not claimed that Mulligan understood the Polish conversation between plaintiff and Pacha. And, even if he had understood it, there was nothing false or misleading in his answer. If it had been in plaintiff's mind to save a cause of action for continuing and future damages rather than to settle as for a permanent injury, his inquiry could have been directed to that point. Mulligan did not purport to read the contract to him, nor did he assume to state what its contents were. It is conceded that the plaintiff had abundant opportunity to ascertain the contents of the contract from the disinterested notary on the following day, and Mul-

ligan knew, when he paid him the consideration, that such opportunity would be afforded to him. To hold that the testimony above quoted is sufficient to nullify the written instrument on the ground of fraud would be to render written contracts practically worthless. *Blossi v. Railway Co.*, 144 Iowa, 698.

So far, therefore, as mere words or statements are concerned, the foregoing is not sufficient to sustain the charge of fraud.

It is contended, however, by the appellee that the unreasonableness of a contract may of itself be an appropriate circumstance in aid of the other testimony as tending to show

2. SAME: fraud: unreasonableness of settlement.
fraud. This proposition may be conceded. We have read the record with great care. In the light of it we find nothing unreasonable in the contract, nor anything inconsistent with the previous negotiations as a whole. The correspondence between plaintiff's attorney and the defendant company indicated an acquiescence in some delay in the negotiations with a view of awaiting developments of the settling or slipping of the right of way. The embankment necessarily interfered to some extent with the course of surface water flowing toward Walnut creek. The rains which fell upon it must necessarily flow down upon the lower land. It must likewise carry with it more or less of the material from the sides of the embankment. Some settling and slipping was inevitable. This had already taken place when the settlement was had. More or less clay had been carried upon the abutting strip of plaintiff's land. Two or three acres of plaintiff's ground was damaged by the various débris thereon. It is undisputed that the full purchase value of the land at the time of the settlement was not more than $60 an acre.

The following excerpt from plaintiff's own evidence as a witness is descriptive of the situation as he claimed it:

In December, 1906, the railroad company bought a fifteen-

foot strip of land from me, on the north side of the creek. Prior to that time, just south of this fifteen-foot strip, there was clay over my land. It was about ten inches or so thick. It covered about two acres. I mean that it was ten inches thick at the edge of this fifteen-foot strip, and then tapered off gradually. Some of that two acres would have more clay on it than other parts. There would be on that two acres an average of four or five inches of clay, in 1906. In December, 1911, the clay on the north side of the creek, close to the right of way, was about ten inches thick. There are no more acres covered with clay than there were in 1906, in December. It is a little thicker than it was in 1906. When I put in the oats in 1907 there was some clay on the ground next to the right of way, which covered about two acres. The oats started to grow. Oats don't make as good a crop on clay land as they do on black soil. So, if there hadn't been any rains on that land covered with clay in 1907, the oats would not have been as good there as on the black soil. Those two acres of oats that I didn't cut in 1907 are the same two acres that were covered with clay in 1906. In 1908 I had this in corn. I plowed about four acres next to the right of way. Included in that four acres were the two acres that were covered with clay in 1906. I sowed wheat on those four acres in the fall of 1908, and sowed clover on it in the spring of 1909. When the wheat killed out in 1909 over those two acres, it killed the clover out also. In 1909 I cut all the wheat except those two acres that were covered with clay in 1906. If the water hadn't gotten over that in 1909, it would not have been as good as the other two acres, anyway. I didn't sow any clover in the spring of 1910. Those two acres that I have spoken of were killed in 1909. There were no rains in 1910 that interfered with that land. There was not much rain in 1911. During the springs of 1907, 1908, and 1909 we had very heavy rains. When we have heavy rains Walnut creek nearly always overflows and goes over my land. . . . After the water enters my land it goes over the same ground that it did in 1906. The company put some tile in along the right of way northeast of the creek in 1907. Prior to the time they put that tile in, the water came down there the same way it does now. The tile just took the place of the open ditch. In 1906 they dug a ditch north of the creek along the right of way from the old right of way to the creek. This ditch filled

up, and about three years later they scraped out another ditch. The water has been running in that ditch ever since it was dug. It was dug in 1909. The water on the north side of the creek· has not been running down there over my land since 1909, except when it rains hard. They didn't dig the ditch deep enough close to the creek.

Adam Peck testified for the plaintiff as follows:

My farm adjoins this twenty-four acres in controversy. I think there is about fifteen or sixteen acres on the north side of the creek that is all flat, except perhaps one acre of it is on a bluff. On the north side of the creek the water runs down the right of way from the northeast for about 3,000 feet. In 1906 there was a ditch cut on the defendant's right of way, along about the last part of December. The ditch was probably ten or twelve inches deep and about eighteen inches wide. This ditch filled up in the spring of 1907. After the ditch filled up in the spring of 1907, the water that came down the right of way spread over Mr. Zaharyas' land. It continued that way until the fall of 1909. Then they cut another ditch. This ditch is probably three feet wide. In some places it is a foot or a foot and a half, and some places two feet deep. The ditch is not as deep now, in places, as it was in 1910. Next to the creek and next to the old right of way, it is deeper now than it was then. The water coming down has made it deeper. This ditch carries some of the water in time of heavy rains. I guess it has carried all the water that has fell this year. 1911 was a pretty dry year. This ditch along the right of way, at the smallest place, is three or four feet wide, and probably eight or ten inches deep. Water coming over the right of way for 3,000 feet above must come through that ditch in order to get to the creek. There has been some tile laid by the defendant on its right of way northeast of the creek. About eighty rods of tile. I think it is a seven-inch tile. The tile empties out on the right of way about forty rods above the plaintiff's land. From there on it has cut out some ditches on the right of way. The ditch it has cut out along the right of way is ten feet wide in places and six or seven deep in places. This ditch has been cutting some along there ever since the railway was constructed.

From the foregoing it will be noted that plaintiff's land is unavoidably overflowed from Walnut creek by every heavy rain. At such times the water from the right of way must necessarily pass upon it. The ditch running parallel with the embankment toward Walnut creek would necessarily be under the same overflow. The damages claimed in this action for 1907, 1908, 1909, 1910, and 1911 are based upon the same acreage and the presence of clay thereon. The ditch, concerning which complaint is made because of alleged insufficiency, can at its best protect plaintiff's land only when there are no heavy rains to overflow it. Plaintiff's own testimony shows that all his claimed damage resulted from heavy rains. There were no heavy rains in 1911, and the trial court found that there was no evidence of damage, and withdrew that part of the claim from the jury. For the remaining four years the jury found damage of only $48. Going back, then, to the settlement of December 11, 1906, can it be said, therefore, to be unreasonable that the parties should treat the embankment as a permanent injury to plaintiff's land to be settled for once for all? Could it be said to be less unreasonable to reserve to plaintiff a continuing cause of action for continuing damages of $10 or $15 per year to be litigated or settled annually? There is nothing apparently unreasonable in the amount paid for the settlement. In the light of the measure of damage adopted by the jury in the present case, the amount paid in the settlement of 1906 was liberal as for permanent injury. On the other hand, to leave to the plaintiff a continuing cause of action for accruing damages would subject the defendant at any time to an order of abatement of the embankment as a nuisance. As already indicated, the order of abatement entered in this case enjoins the defendant from permitting the water which falls upon its right of way from being discharged upon or across or over the land of the plaintiff. Necessarily water must fall upon the right of way, and it must run down the embankment, and it must run upon plaintiff's land in all times of heavy rain and overflow. Strict obedience

to this order would require the removal of the embankment.

It must be said, therefore, that there is nothing unreasonable or unconscionable in the contract as written which can operate as a circumstance in support of the allegations of fraud.

II.    The evidence in this record shows without dispute that it was the understanding between the parties that the defendant company would cut a ditch along or parallel with its right of way for the purpose of carrying a stream of water southwesterly to Walnut creek. Such provision does not appear in the contract. But the ditch was immediately cut, according to testimony on behalf of the plaintiff. It became filled and was again cut in 1909. Whether the plaintiff would be entitled to a reformation of the contract as for mutual mistake as to the provision for the ditch is a question which cannot arise in this case. Even if the provision were contained in the written contract, the plaintiff's case is not bottomed upon the failure of the defendant to cut or maintain the ditch. The ditch was confessedly in operation a part of the time. The testimony in behalf of the plaintiff shows that it was in operation at least in 1910 and 1911, and at least a part of 1907. The damage described by the plaintiff in his testimony for each of such years was identical, regardless of the condition of the ditch. That the ditch cannot protect the plaintiff against the overflow of heavy rains is conceded in his testimony, as already quoted.

All that we hold now is that the evidence wholly fails to sustain the charge of fraud, and this is decisive of this appeal. The judgment and order entered below must therefore be *Reversed.*

LADD, C. J., and WEAVER and PRESTON, JJ., concur.