No. 22,899.

SARAH E. BURNS, *Appellant,* v. MINNIE D. SPIKER et al., *Appellees.*

### SYLLABUS BY THE COURT.

1. ANTENUPTIAL CONTRACT — *Understandingly Entered Into — Enforceable.* An antenuptial contract between a widower having four children and a widow having seven, providing that her share of his property if she survived him should be limited to one-fifth, that she should take care of his children as though they were her own, but that her own children should be put to work to earn their own living as soon as they were able, he not to be liable for their support thereafter, and that he might refuse to keep at his home any of them that refused to obey him, is not so unfair as to be unenforceable or to place upon those claiming under it the burden of producing affirmative evidence that it was understandingly entered into.

2. SAME—*Prospective Wife Unable to Read—No Presumption of Fraud or Imposition.* The fact that the prospective wife who signs an antenuptial contract cannot read does not of itself raise a presumption

Burns v. Spiker.

that any fraud or imposition was practiced upon her, even in the absence of affirmative evidence that it was read to her or that its contents were stated to her.

3. SAME—*No Deception Shown.* The evidence is held not to have necessarily established any fact tending to show that any deception was practiced in the present case.

4. WILL—*Wife's Consent to Husband's Will.* The decision of the trial court giving effect to the wife's written consent to her husband's will is held to be supported by the evidence.

5. SAME—*Will by Wife's Written Consent—May Dispose of Wife's Homestead Rights.* By a will to which his wife consents in writing in the presence of subscribing witnesses a husband may dispose of all his property, including that occupied as a family residence, and thereby cut off the right of his widow to continue in its occupancy as a homestead; and such a will which in general terms bequeaths and devises to persons named all the testator's property without specifying any items and without making any exceptions or reservations is to be construed as intended to have that effect.

6. SAME—*Disposition of Personal Property.* By a will to which a wife gives her consent in accordance with the statute her husband may dispose of all his personalty, including that which is exempt.

Appeal from Jackson district court; GEORGE H. WHITCOMB, judge, *pro tem.* Opinion filed May 7, 1921. Affirmed.

*Oscar Raines,* of Topeka, and *T. A. Moxcey,* of Atchison, for the appellant.

*A. E. Crane,* of Topeka, and *Thomas A. Fairchild,* of Holton, for the appellees.

The opinion of the court was delivered by

MASON, J.: Sarah E. Burns, the widow of John T. Burns, brought this action against his four children by a former wife, and other defendants, the principal purpose being to procure a division of his estate under the law of descents and distributions instead of according to the terms of a written antenuptial agreement and a will to which she had given her consent in writing, both of which instruments she claims to be invalid. Judgment was rendered against her and she appeals.

1. The plaintiff contends that the provisions of the antenuptial contract are so unconscionable as to render it unenforceable, or, at all events, to cast upon the defendants the burden—which was not met—of proving it to have been en-

tered into with full understanding on her part; that the evidence required a finding that there was either actual fraud in procuring her signature to the contract, or the existence of such conditions as in equity to require it to be set aside.

At the time the contract was entered into, November 23, 1897, the plaintiff was about thirty-nine years old. Her first husband, a brother of John T. Burns, had died about a year before. Seven children of that marriage survived, two of them being married, the other five living with her, the youngest being three years of age. She had no considerable property. John T. Burns was fifty-five years of age; a widower with four children, all of whom survived him. His property consisted of an eighty-acre farm in Jackson county on which he lived, worth $2,000, subject to a mortgage of $600, and personalty worth $500. He was unable to work. His eyesight was very bad; he was practically blind, subject to rheumatism, and later a cancer developed. He received a pension of $75 a month. He died June 7, 1917, his estate then amounting to nearly $20,000, the Jackson county farm—the homestead— figuring in this estimate at $8,000, a Meade county farm at a like amount, an accumulation of pension money at $800, and growing crops at $1,000; the remainder being made up of stock, implements, household goods and other personal property. One child, who still lives, was born to the plaintiff and her second husband, in 1901.

The antenuptial contract provided that if the wife survived the husband she should receive only one-fifth of his estate—that is, an equal share with each of his four children, the portion of any child that might die before the father to go to the surviving children. Other provisions were that the wife should care for the husband's children as if she were their mother; but that as soon as any of her children became able to earn its own living she should find some place for it to work and the husband should not be held liable for its support; and that he might refuse to keep any of them around the farm who refused to obey him. The husband released all claims to his wife's estate, but this was so small as to be unimportant.

We do not regard the contract as so unfair as to be unenforceable or to cast upon those relying upon it the burden of producing affirmative evidence of its having been fully under-

Burns v. Spiker.

stood, its voluntary execution being admitted. There is no room for a suggestion that the wife was misled as to the extent of the husband's estate—that he had property the existence of which he concealed from her. His possessions consisted mainly of the home farm, which was mentioned in the contract. The difference in his financial worth at the time of his marriage and at the time of his death was real and not merely apparent. The increase was due to new accumulations and rise in values, not to the bringing to light of concealed assets. Moreover, the wife, being allotted a fractional part of the estate, shared in the benefit of the increase in the same proportion. The one-fifth interest in her husband's property assigned to the plaintiff by the contract is not so much less than the half interest to which she would have been entitled under the law as to condemn the settlement as inequitable. An antenuptial contract which was evidently used to a considerable extent as a model in the preparation of that now under consideration, and in which the "child's share" which was allotted to the wife amounted to but one-eighth, the husband having seven children, was upheld by this court. (*Hafer v. Hafer,* 33 Kan. 449, 6 Pac. 537.)

The provision of the contract with respect to the wife's children was certainly ungracious, but we do not regard it as sufficient to vitiate the contract. The fact that the accumulation of the property in question is largely due to the efforts of the plaintiff is urged in support of her claim. Her husband's almost helpless physical condition of course prevented him from sharing in the manual toil, but it is not clear that his advice and direction may not have been an important factor in the matter. He was obviously a close bargainer, while the plaintiff is represented as not being much of a business woman. It is not disputed that the property in controversy belonged to the husband, and the basis of its division at his death having been fixed by a valid contract, the court has no power to vary the apportionment because of the meritorious conduct of the plaintiff. Of a somewhat similar situation it was said in a former case:

"Some make-weight allegations are inserted in the petition, to the effect that through the joint efforts of husband and wife, incumbrances on the land in controversy were paid off, and valuable, permanent im-

provements were placed on it. The plaintiff does not ask for compensation, or for a lien. What she wants is one-half the land, something she is not entitled to receive." (*Osborn v. Osborn,* 102 Kan. 890, 895, 172 Pac. 23.)

The validity of an antenuptial agreement is not determined by precisely the same considerations in all jurisdictions. These rules have been declared in this state:

"It would seem from the authorities, that agreements of this kind are generally looked upon by the courts with favor, and are to be liberally interpreted with a view of carrying out the intentions of the persons engaging in them. We entertain no doubt, in the present state of our statutes, of the validity of an ante-nuptial contract, entered into in good faith by parties competent to contract, and which, considering the circumstances of the parties at the time of making the same, is reasonable and just in its provisions, and that the rule thus agreed upon will take the place of that prescribed by the statute, in the distribution of their property upon the death of either." (*Hafer v. Hafer,* 33 Kan. 449, 459, 6 Pac. 537.)

"If the intended wife is competent to make a contract and has a fair and adequate knowledge concerning the future husband's property when she enters into an ante-nuptial agreement which is free from deceit or fraud, it should not be set aside merely because the court or jury find that the provision made for her is in great disproportion to his property." (*Gordon v. Munn,* 87 Kan. 624, 635, 125 Pac. 1.)

2. A daughter of the plaintiff testified that her mother was illiterate—not educated; that she could read large print and sign her name, but nothing further. This fact, unless some fraud or imposition is shown, does not affect the validity of the contract or shift the burden of proof as to its having been understandingly entered into.

"It is the duty of every contracting party to learn and know its contents before he signs and delivers it. He owes this duty to the other party to the contract, because the latter may, and probably will, pay his money and shape his action in reliance upon the agreement. To permit a party, when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made, or to allow him to admit that he signed it but did not read it or know its stipulations, would absolutely destroy the value of all contracts. The purpose of the rule is to give stability to written agreements, and to remove the temptation and possibility of perjury, which would be afforded if parol evidence was admissible. . . . The rule that one who signs a contract is presumed to know its contents has been applied even to contracts of illiterate persons on the ground that if such persons are unable to read, they are negligent if they fail to have the contract read to them. If a person cannot read the instrument, it is as much his duty to pro-

cure some reliable person to read and explain it to him, before he signs it, as it would be to read it before he signed it if he were able to do so, and his failure to obtain a reading and explanation of it is such gross negligence as will estop him from avoiding it on the ground that he was ignorant of its contents." (6 R. C. L. 624, 625.)

"Where a person cannot read the language in which a contract is written, it is ordinarily as much his duty to procure some person to read and explain it to him before he signs it as it would be to read it before he signed it if he were able so to do, and his failure to obtain a reading and an explanation of it is such gross negligence as will estop him from avoiding it on the ground that he was ignorant of its contents." (13 C. J. 372.)

The circumstances attending the execution of an antenuptial agreement are of course to be examined in a very different light from a contract between strangers or persons between whom no relations of confidence exist. But in either case there is no essential difference between a literate person signing a paper without reading it and an illiterate person signing it without ascertaining its contents in some other way. The mere fact of illiteracy does not raise a presumption of overreaching. Expressions are to be found to the effect that one who relies upon a contract signed by an illiterate person has the burden of proving that it was understandingly entered into, if a claim to the contrary is made. (13 C. J. 373, note 41.) We conceive the true rule to be, however, that it is only where some fact is established tending to show the practice of deception that the necessity arises of producing affirmative evidence in support of the good faith of the transaction.

3. Here the plaintiff introduced evidence the purpose of which was to show that the contents of the antenuptial contract that was signed were different from what the plaintiff with good reason supposed them to be. An acquaintance testified that just before the marriage John T. Burns told him that he and the plaintiff had agreed that in case he died first the children were to share alike and she should have an interest during her lifetime, and that the witness told the plaintiff what he had said. The plaintiff testified that she was not present when the antenuptial contract was being drawn up and that it was not read over to her; that she never had but one understanding with her husband with reference to the property she was to receive after his death; that she did not know there was any contract or will or anything until the

day after he was buried. A daughter of the plaintiff testified that about two weeks after the marriage she heard the plaintiff's husband say in the presence of the plaintiff that he had needed a housekeeper and she had needed a home for herself and her children and that she would get his pension and would always have a home—that he was to provide a home for her children; that he would not likely live long and that she would have a home for herself and children; he did not mention putting the agreement in writing. With the exception of the plaintiff's statement that the contract was not read to her, which the trial court must be presumed to have discredited, there being no special findings, this evidence has little bearing upon the plaintiff's information as to the contents of the paper she signed, and so far as it tended to show a want of knowledge on her part it may not have been believed. The *prima facie* effect of the executed contract therefore remains the same as though such evidence had not been introduced.

4. The defendants' case, however, does not rest upon the antenuptial contract but is supported also by the will which was executed about two weeks after the marriage, the plaintiff signing a consent to it in the presence of subscribing witnesses. The will was short and simple. It merely in general terms gave all the testator's property, without describing any or referring to any particular item, share and share alike to the plaintiff and his four sons. Affirmative evidence was introduced that the written consent which the plaintiff signed was read to her. There was no evidence tending to show that she did not understand the effect of it unless that quality be attributed to the testimony already recited, or to the statement of witnesses that after the marriage the plaintiff's husband told them that he had felt it his duty to marry her so if he died she could have his pension and have a home for her children, and that he expected to have it so that the farm would be her home while she lived, and if he died first he had it fixed so it would be her home while she lived. We find in this no basis for reversing the action of the trial court in giving effect to the plaintiff's written consent to the will.

5. At the time of the death of the plaintiff's husband the Jackson county farm was occupied as the family residence. The plaintiff contends that even conceding the validity of the

Burns v. Spiker.

antenuptial contract and the written consent to the will she is entitled to remain in the occupancy of the farm during her life (unless she should remarry) in virtue of its character as a homestead. It is settled that her right to continue in possession of the property was not lost by signing the antenuptial contract (*Hafer v. Hafer,* 33 Kan. 449, 6 Pac. 537; *Watson v. Watson,* 106 Kan. 693, 189 Pac. 949), and the question to be determined is whether at the death of her husband the will, having been consented to by her, passed at once a full title including the right of immediate possession to the legatees—the plaintiff and her four stepchildren. The argument in support of an affirmative answer may be thus stated:

The will having been consented to by the plaintiff in the manner provided by statute, upon its probate became effective according to its terms and the full title to all the testator's realty passed at once to the devisees with all the rights incident thereto, there being no exceptions or reservations of any kind. The situation was substantially the same as though the plaintiff after her husband's death had elected to take under the will. A widow who takes under the will can get nothing additional under the law, even where there is property undisposed of by the will. (*Compton v. Akers,* 96 Kan. 229, 150 Pac. 219.) If the provisions of the will are inconsistent with the homestead rights the widow must elect between them. (40 Cyc. 1970.) The doctrine of the Hafer case that a homestead right cannot be waived in an antenuptial contract goes to the extreme limit in that direction and should be extended no further. The Illinois case (*McMahill et al. v. McMahill,* 105 Ill. 596) there cited in support of the view taken was decided by a bare majority of the court and has since been overruled. (*Colbert v. Rings,* 231 Ill. 404. See *Watson v. Watson,* 107 Kan. 193, 191 Pac. 482.) The Hafer case, however, presents a quite different situation from the present. There, the marriage not having taken place, no homestead right had accrued. There is no statutory provision for its waiver at that stage. The statute, however, does specifically provide for one spouse giving effective consent to the will executed by the other. A wife by joining with her husband in a deed to land occupied as a family residence, although no reference is made therein to the homestead right, parts not only with the title but with

all rights of occupancy as well, and in this aspect the act of consenting to her husband's will which makes a similar disposition of it is not essentially different.

On the other hand an argument to this effect may be made in favor of the plaintiff's contention, requiring a negative answer to the question whether the will cut off her homestead right:

The grounds upon which the decision in the Hafer case was based were that the antenuptial contract did not in terms refer to the homestead privilege and did not show a purpose to waive it, and that apart from this consideration public policy would forbid a waiver in such manner. Here the will does not in terms refer to the homestead privilege, and it does not disclose a purpose to waive it by any language substantially different in effect from that of the antenuptial contract in the Hafer case. The will says that the testator devises and bequeaths all his property, real and personal, to his wife and four sons in equal shares. The contract said that the husband should forever separately hold, own, use, possess, convey and dispose of all his property, real and personal, except the "child's part" to be received by his wife, to the same extent as though he were not married. The phraseology appears in one case as much as the other to exclude the idea that the wife was to enjoy a homestead right in addition to the "child's share." The two instruments were made within a few weeks of each other and the will manifestly was intended to give effect to the provisions of the antenuptial contract and not to subject the plaintiff to a diminution of her rights as therein provided. The public policy of preserving the homestead right for the benefit of the widow and any minor children—to the end that they may not suffer from poverty or burden the public with their support—appears to have the same room for operation after the marriage as before. While there is no statute in terms permitting the making of antenuptial contracts the law permits them and places no express limitation upon them with respect to homestead rights. The statute fairly implies that one spouse with the written consent of the other may dispose of all his property by will (possibly subject to the homestead right) but the language from which this implication results is merely that "either may consent in writing, executed in the

Burns v. Spiker.

presence of two witnesses, that the other may bequeath more than one-half of his or her property from the one so consenting." (Gen. Stat. 1915, § 11790.) This may be interpreted in connection with the provision forbidding the distribution of the homestead while it is occupied by the widow and minor children (Gen. Stat. 1915, § 3825) as not intended to impair that prohibition. The antenuptial contract, the will and this statute may all be regarded as contemplating that the title to all the husband's property, including that occupied as a family residence, upon the death of the husband shall pass to his devisees, but that the right of occupancy in the surviving members of the family shall continue, not even partition to be permitted, until the children become of age or the widow dies or remarries. (Gen. Stat. 1915, § 3828.) The statutory authority of the husband to dispose of all his property by will with his wife's consent is given in no more explicit, absolute and unqualified terms than the statute employs in giving him a right to dispose of half of it in that manner without her consent. (*Carmen v. Kight,* 85 Kan. 18, 116 Pac. 231; *Breen v. Davies,* 94 Kan. 474, 146 Pac. 1147.) Yet the widow and children cannot be deprived of the right to occupy the homestead after the death of the husband by a will executed by him without her consent devising to others a half interest therein. (*Vining v. Willis,* 40 Kan. 609, 620, 20 Pac. 232.) This result is prevented by construing the statute authorizing the husband to dispose of half his property by will irrespective of his wife's wishes in connection with the statute preserving to the widow the right to continue in the occupancy of the homestead. In the same way the homestead statute may be deemed to affect the interpretation of that which allows the husband with his wife's consent to dispose by will of all his property. In Oklahoma a wife's homestead privilege has been held not to be subject to disposition by her husband's will to which she had consented, and the reasoning seems in point here although the decision is affected to some extent by differences of local law. (*Bacus v. Burns et al.,* 48 Okla. 285. See, also, *Koster v. Gellen,* 124 Mich. 149.)

Upon weighing all these considerations the court adopts the view that by a will to which his wife consents in writing in the presence of subscribing witnesses a husband may dispose

of all his property, including that occupied as a family residence, and thereby cut off the right of the widow to continue in its occupancy; and that such a will which in general terms bequeaths and devises to persons named all his property without specifying any items, and without making any exceptions or reservations, is to be construed as intended to have that effect. It results from this that the plaintiff has no right to the possession of the homestead except as the owner of a one-fifth undivided interest therein.

6. The plaintiff contends that, conceding the validity of the consent to the will, she is still entitled to have set off to her the exempt personal property under the provisions of the statute in relation thereto. (Gen. Stat. 1915, §§ 4533-4535, as amended by Laws 1917, ch. 186.) It has already been held that the statute enables a husband to dispose of a full half of his property by will notwithstanding these provisions. (*Breen v. Davies,* 94 Kan. 474, 146 Pac. 1147.) We think it follows that his statutory right to dispose of all his property by will with her consent enables him to divert to others the exempt as well as the nonexempt personalty. This question is less difficult than that presented by the homestead claim because the homestead right is not a mere exemption but a privilege of a much broader character.

The conclusions already announced make it unnecessary to consider questions that have been presented with regard to the acquiescence of the plaintiff in the leasing of the homestead.

The minor son of the plaintiff and her second husband was represented by a guardian *ad litem* and asserted a claim with respect to the homestead, but as no appeal was taken in his behalf no question is presented in that connection.

The judgment is affirmed.

MASON, J. (dissenting in part) : To my mind the reasoning of the Hafer decision, if carried to its logical conclusion, requires a holding that the plaintiff is not deprived of the homestead privilege. I therefore dissent from the fifth paragraph of the syllabus and the corresponding part of the opinion.

JOHNSTON, C. J., and WEST, J., join in the dissent.