FIRST NATIONAL BANK OF SIOUX CENTER, Appellee, v. EVERT TEN NAPEL et al., Appellants.

**EVIDENCE:** Burden of Proof—Fiduciary Relations. A person who
1 holds a fiduciary or confidential relation towards another person must assume the burden of showing that a benefit or advantage acquired by him from such other person was entirely free from fraud of any kind. Evidence held quite insufficient to show such relation between a bank and a mortgagor.

**CONTRACTS:** Validity of Assent—Signing by Illiterate Without Fraud.
2 A wife who can neither speak, read, nor understand the English language may not, nevertheless, against an innocent mortgagee, avoid a mortgage on her homestead when, on the mere request of her husband, and without being in any manner misled, deceived, or

circumvented, she signed the mortgage, without knowing, asking, being told, or being prevented from learning what the instrument was; and in such a case, it is quite immaterial that the husband secretly intended, *if necessary,* to mislead and deceive the wife into signing the instrument.

**ACKNOWLEDGMENT:  Nature—Nonnecessity Between Parties to In-
3  strument.**  Acknowledgment is unnecessary between the immediate parties to the instrument.

*Appeal from Sioux District Court.*—William Hutchinson, Judge.

OCTOBER 24, 1924.

ACTION to foreclose a mortgage upon the homestead of defendants.  From a decree for plaintiff, defendants appeal.— *Affirmed.*

*Hatley & Van de Steeg,* for appellants.

*Anthony Te Paske,* for appellee.

VERMILION, J.—It is admitted that the property covered by the appellee's mortgage is the homestead of the appellants. The mortgage was given to secure the existing indebtedness of the husband, the notes described in the mortgage being signed by the husband and a son only, and being of earlier date than the mortgage, or in renewal of earlier like notes.

The defense presented is that the wife could not read or understand the English language, and that her signature to the mortgage was procured by fraud on the part of her husband and the president of the bank; and that, being upon the homestead, if invalid as to her, it was also invalid as against the husband.

It is no doubt true, as claimed by appellants, that, when Mrs. Ten Napel executed the mortgage on the homestead,— assuming it to be valid,—she simply pledged her interest in the property as additional security to the bank on the notes of her husband and son; and that, since the bank parted with nothing,

and she derived no benefit from the transaction, and there was no consideration moving to her, she was in the attitude of a mere surety, and entitled to the protection of a surety. *Lingen-felter Bros. v. Bowman*, 156 Iowa 649. Furthermore, if the officers of the bank procured her husband to obtain her signature to the mortgage by fraud,— that is, if they connived or arranged with him to secure her signature by deceit or artifice, and by fraudulently preventing her from learning the character of the instrument she was signing, and her signature was in fact so obtained,—it could not be claimed that she could not success-fully defend against the mortgage. And if they knew, at the time they accepted the mortgage, that her signature had been so procured, although they were not originally parties to any fraudulent plan, the defense would be available to her. *Bank of Monroe v. Anderson Bros. M. & R. Co.*, 65 Iowa 692; *Barnes v. Century Sav. Bank*, 149 Iowa 367.

There is no testimony that would warrant a finding that the officers of the bank were parties with the husband to a fraudulent scheme to procure the wife's signature to the mort-gage by artifice or fraud. The husband did not testify that he told them of any purpose on his part to deceive his wife. He said: ''I thought we [meaning himself and Mouw, the presi-dent] could do it.'' But there is nothing to show that the thought was expressed, or that Mouw was made aware of it, or tacitly or expressly assented to it. Both Mouw and Boeyink, who was also connected with the bank, and had something to do with the transaction, testified that they had no knowledge of any fraudulent purpose on his part, and that they had no knowledge that the wife claimed to have been deceived until sometime after the mortgage was received, when efforts were made to collect the debt. The latter testified that Ten Napel told him that his wife was now ready to sign the mortgage. There was no respect in which the bank failed to perform any duty or obligation it owed to Mrs. Ten Napel in her capacity as surety.

There is a contention as to where the burden of proof rests. It is insisted by appellant that, by reason of the relationship of the parties, the burden is upon the bank to establish that the

1. EVI: ... burden of proof: fiduciary relations.

mortgage was obtained honestly, fairly, and without trickery or fraud. The authorities cited in support of the claim announce the familiar rule that, where a fiduciary or confidential relation is shown to exist between the parties to a transaction, the burden is upon the one claiming a benefit therefrom to establish entire fairness on his part, and freedom of the other from undue influence; but they do not sustain the attempted application of the doctrine to the present facts. No confidential relations existed between the bank and Mrs. Ten Napel; nor do the facts warrant the conclusion that the husband was the agent of the bank. The officers of the bank were pressing for security for the notes. The husband was willing to give the mortgage in question, and suggested that the instrument be prepared, and he would take it to get his wife to sign it. It is true, the mortgage was for the benefit of the bank; but the husband was willing to give it, and undertook to procure the wife's signature, to carry out his purpose to give the mortgage. There is nothing in the mere relationship of the plaintiff and defendants to raise any presumption of a domination by one over the other, or to cast on the plaintiff the burden of proving that the wife had a full understanding of the instrument she was executing.

It is well settled that mere illiteracy or inability to read is not, in the absence of fraud, a ground for avoiding a contract signed in ignorance of its contents. *Blossi v. Chicago & N. W. R. Co.,* 144 Iowa 697; *Zaharyas v. Chicago, R.*

2. CONTRACTS. validity of assent: signing by illiterate without fraud.

*I. & P. R. Co.,* 164 Iowa 71; *Erickson v. Knights of Maccabees,* 71 Colo. 9 (203 Pac. 674); *Morstad v. Atchison, T. & S. F. R. Co.,* 23 N. M. 663 (170 Pac. 886); *Burns v. Spiker,* 109 Kan. 22 (202 Pac. 370); *Mackintosh v. Cioppa,* 245 Mass. 152 (139 N. E. 445); *Shulman v. Moser,* 284 Ill. 134 (119 N. E. 936). The fact of illiteracy has, however, an important bearing on the question of the existence of fraud in procuring the signature; and where fraud or deception are shown, it has been held incumbent on the party relying on the contract to show that it was executed with a full understanding of its terms and effect. 13 Corpus

Juris 373; *Spelts & Klosterman v. Ward* (Neb.), 96 N. W. 56; *Burns v. Spiker,* supra. It is said in the case last cited:

"We conceive the true rule to be, however, that it is only where some fact is established tending to show the practice of deception that the necessity arises of producing affirmative evidence in support of the good faith of the transaction."

It appears from the husband's own testimony, and without dispute, that he intended to procure his wife to sign the mortgage in ignorance of what it was. He testified that Mr. Mouw, the president of the appellee bank, had asked for a mortgage on the home, and he had told him that his wife would not sign the mortgage. We quote the following from his testimony:

"Q. What did Mr. Mouw say to you,—what talks did you have with Mr. Mouw at the time the mortgage was made out? A. Well, I was up there several times, to get security for that money; I could not do that. Then Mr. Mouw said: 'Give me security on the house.' I said: 'My wife does not do that;' and then I thought we could do it, to make out this paper and take it along and let her sign it unknowingly."

It also appears that the wife signed the mortgage in ignorance of its true character. The husband further testified:

"He drew the mortgage and I signed it. I then took it with me, and three or four days afterwards I said to her: 'I have to go to the farm; just sign this paper a minute.' And I said at the same time, I would like to bring that to the bank. She signed it, and I went to the First National Bank and handed it to Mr. Mouw. I did not explain to my wife what the paper was, either before or after she signed it, and she was ignorant of its contents."

The wife testified, through an interpreter, that she could not speak, understand, or read English; that she signed the mortgage, and that it was not read over to her or explained to her before she signed it; that she had told her husband that she would not sign a mortgage on their home. She said:

"My husband came into the house, showed me a paper, and said: 'I am going to the farm; just put your name on that a minute.' * * * After I signed the paper, he put it in his pocket and went away."

She did not deny that he said he "would like to bring that to the bank." The fact that the husband intended to secure her signature "unknowingly," as he says, while establishing his fraudulent purpose, does not prove that he actually practiced such fraud or trickery in procuring her signature as will enable her to avoid the mortgage. In other words, the evidence cannot be said to go further than to establish a purpose on his part to deceive his wife, and to resort to artifice and fraud to that end, if necessary. But it affirmatively appears that no artifice or fraud were in fact used. There was no false statement made as to what the document was. She testified that she thought it related to the farm; but there was nothing in what was said to justify such a belief. His statement that he had to go to the farm had no connection with the paper she was asked to sign, unless it was to indicate that he was in haste. She made no inquiry as to what she was signing, although advised that it was to go to the bank, and although she must have known, since she had previously told her husband she would not sign a mortgage, that the bank was insisting on a mortgage on their home. Whatever may have been the husband's intentions as to deceiving his wife, if necessary to do so to secure her signature, the uncontradicted testimony shows that he in fact practiced no fraud or artifice upon her; that he did no more than to put the document before her, with a request that she sign it; and that, merely upon his request, and without inquiry as to what it was, she affixed her signature. In the absence of any showing that fraud or artifice was practiced upon her to obtain her signature, it follows that there is no ground for saying that it was incumbent on plaintiff to establish affirmatively that she had a full understanding of the terms and effect of the instrument she signed.

The ultimate question is whether she is to be held to have signed the mortgage negligently, and is therefore bound, or whether she was induced to do so by such trickery, artifice, or fraud on the part of her husband as will relieve her from the consequence of her act. And, unless it must be said that the plaintiff was required to establish affirmatively a correct understanding on her part of the instrument she signed, it is plain

that no such a state of facts is shown as will entitle her to relief on the ground of fraud.

If the wife was not induced by trickery or fraud to sign the mortgage, or thereby prevented from ascertaining the character of the instrument she signed, the mere fact of her inability to read it, and the fact that she signed it without being informed of its character, would not entitle her to relief. In *Blossi v. Chicago & N. W. R. Co.,* supra, the court quotes approvingly the language of Judge Sanborn in *Chicago, St. P., M. & O. R. Co. v. Belliwith,* 83 Fed. 437, as follows:

"If one can read his contract, his failure to do so is such gross negligence that it will estop him from denying it, unless he has been dissuaded from reading it by some trick or artifice practiced by the opposite party. If he cannot read it, it is as much his duty to procure some reliable person to read and explain it to him, before he signs it, as it would be to read it before he signed it if he were able to do so; and his failure to obtain a reading and explanation of it is such gross negligence as will estop him from avoiding it on the ground that he was ignorant of its contents."

The statement has been substantially embodied in standard works on the law. 6 Ruling Case Law 624; 13 Corpus Juris 372. See, also, *Midland Mtg. Co. v. Rice,* 197 Iowa 711, and cases cited.

Some claim is made that the mortgage was not acknowledged by the wife. That fact, if established, would not affect the validity of the mortgage as between the parties. No subsequent purchasers, who might question the notice imparted by the record of the mortgage, are making the claim. The testimony of the notary who claimed to have taken her acknowledgment, while contradicted by her, went no further, so far as the execution of the mortgage was concerned, than to show an admission that she had signed it. This was admitted in the answer.

3. Acknowledgment: nature: nonnecessity between parties to instrument.

The record discloses no reason for disturbing the decree below, and it is—*Affirmed.*

Arthur, C. J., and Stevens and De Graff, JJ., concur.