No. 25,959.

ISABELLE HOARD, *Appellee*, v. MARY B. JONES et al., *Appellants and Appellees*, VERBIA A. MOORMAN, *Appellant*, and WILMA HOARD and C. W. HOARD, *Appellees*.

### SYLLABUS BY THE COURT.

1. CONTRACTS—*Invalidating Written Instrument—Evidence—Sufficiency.* When a party voluntarily signs and delivers an instrument affecting property rights, and thereafter seeks to refute it on the ground of fraud of the other party thereto which induced its execution, such fraud should be made clearly to appear before the instrument is declared invalid.

2. HUSBAND AND WIFE—*Antenuptial Agreements—Revocation.* An antenuptial agreement may be revoked by the parties after their marriage by mutual consent, or by an agreement based upon a sufficient consideration.

3. SAME—*Antenuptial Agreements—Contract to Revoke—Consideration.* The consent of the wife to execute a deed to the homestead is sufficient consideration to support a contract with her husband to revoke an antenuptial agreement.

4. FRAUDS, STATUTES OF—*Operation and Effect—Revocation of Contract.* The statute of frauds deals with the making of contracts rather than with their revocation; hence, though a contract is one which, by the statute of frauds, must be in writing to support an action, it may be revoked by parol.

5. SAME—*Operation and Effect—Modification of Contract.* A modification of a contract is in effect the making of a new contract, and if the original contract to be enforceable by action must be in writing under the statute of frauds, a modification of the contract to be enforceable by action must be in writing.

6. DEEDS—*Delivery—Burden of Proof—Evidence.* The possession by the grantee, or by a third person for the grantee, of a deed, duly executed and acknowledged, purporting to convey full title to real property, with the grantor's reservation of its use during his life, raises a presumption of delivery which can be overcome only by clear and convincing evidence. The burden of showing nondelivery is upon those who contend that such deed was not delivered.

7. SAME—*Delivery—Evidence.* H. and wife executed two deeds for separate properties, one to M. and one to J., daughters of H. by a former wife, reserving the use of the properties during the life of H. H. went to a bank with M., rented a safety-deposit box in her name, giving her the receipt therefor, gave her a key to the box, showed her (she was blind) how

---

1. Contracts, 13 C. J. § 979.    2. Husband and wife, 30 C. J. § 221.    3. Id., 30 C. J. § 223.    4. Frauds, Statute of, 27 C. J. 418.    5. Id., 27 C. J. 416; Contracts, 13 C. J. § 416.    6. Deeds, 18 C. J. §§ 106, 496, 548; 54 L. R. A. 865; 38 L. R. A. (N. S.) 941; 8 R. C. L. pp. 985, 991.

to lock and unlock the box, placed the two deeds in the box and told her what they were and what he was doing, and told her to keep the one to her and to deliver the other to her sister J. after his death, which M. did. *Held,* this constituted a valid delivery of the deeds from the grantor to M. And further *held,* the fact that H. retained a key to the box, of itself, in the absence of any evidence that he did so in order to retain control of the deeds, will not overcome the evidence of their delivery.

8. Same—*Delivery—Necessity.* H. bought and paid for two residences, and at his request the vendor executed two deeds to him, blank as to grantee, which blanks he was authorized to fill. H. took possession of the properties, made substantial improvements thereon, and remained in possession until his death some three years later. After his death the deeds were found unrecorded among his private papers in his safety-deposit box at the bank. When found, the name of M., a daughter, had been written by H. as grantee in one of them, and the name of J., another daughter, as grantee in the other. *Held,* the deeds as found indicated gifts to the daughter intended to take effect at H.'s death; that they are not sufficient for that purpose, as they were not executed as required by the statute for executing wills, and that the real property described in them is subject to partition among the heirs of H.

9. Same—*Delivery—Uncontroverted Question—Directed Verdict.* The question of the delivery of a deed is largely a question of intention, ordinarily to be determined by the jury or trial court as a question of fact, but when the facts are not controverted the question should be determined by the court as a question of law, and when the facts have been fully tried, leaving only questions of law to be decided, this court may direct the entry of a proper judgment—following *Worth v. Butler,* 83 Kan. 513, 112 Pac. 111.

Appeal from Saline district court; DALLAS GROVER, judge. Opinion filed July 11, 1925. Modified.

*J. O. Wilson* and *J. H. Wilson,* both of Salina, for appellant Verbia A. Moorman; *A. R. Buzick, Jr.,* and *William S. Norris,* both of Salina, for the appellants and appellees Mary B. Jones, W. H. Jones and Horace Jones.

*Z. C. Millikin,* of Salina, for appellee Isabelle Hoard; *C. W. Burch, B. I. Litowich,* and *LaRue Royce,* all of Salina, for appellees Wilma Hoard and C. W. Hoard.

The opinion of the court was delivered by

HARVEY, J.: This is an action to partition real property among the heirs of William Hoard, deceased. The plaintiff is his widow and the defendants are his children and grandchildren by a former

---

7. Deeds, 18 C. J. § 114.  8. Id., 18 C. J. § 208.  9. Id., 18 C. J. § 125; Partition, 30 Cyc. p. 247.

marriage. It was tried to the court with an advisory jury. The controverted questions relate to an antenuptial agreement, which was set aside by the court; to the delivery of two deeds, one to each of two children, under which they respectively claimed specific property, which claims were disallowed by the court; and to property purchased by William Hoard, for which he took deeds blank as to grantee and later wrote in the names of certain of his children as grantees, under which deeds they respectively claimed those properties, which claims were disallowed by the court. Defendants whose claims were disallowed have appealed.

The property is situated in the city of Salina and consists of three separate properties, which are known to the parties as the North Santa Fe property, the South Santa Fe property and the Walnut street property. The North Santa Fe property is a two-story brick building. The first floor was rented for a meat market and the second was used as a rooming house. It is the most valuable property of the three. The South Santa Fe property consists of two buildings situated on adjoining lots, or parts of two lots, rented and used as garages. The Walnut street property consists of two residence properties on adjoining lots or tracts.

In 1906 William Hoard and his first wife, who were then living on a farm in Saline county, became estranged and separated. The farm was sold, a financial settlement was made, and they were divorced in 1909. They had four children: Mary B. Jones, who was married and living in Salina; Verbia A. Moorman, who was married and living on a farm near Solomon, in Saline county; Wilma Hoard, then teaching school in Iowa; and C. W. Hoard, a son, seventeen, who was living at home. After the separation Mrs. Hoard and her son moved to Salina, where they lived for two or three years, then went to Indiana, where the daughter Wilma was then teaching. Since then the mother has made her home with Wilma, wherever she was teaching. In a few years they went to California, where they have since lived. C. W. Hoard lived with his mother and sister until he was twenty-one, then entered the postal service, where he was employed for ten years, and in 1920 went in business for himself in New Mexico. Since the separation of her parents Wilma visited her father once, in 1917. She wrote him a few letters, which he did not answer. In that time C. W. Hoard visited his father once in 1920 and twice in 1921. At each of these visits he sought financial assistance. His father signed notes for

Hoard v. Jones.

him at a Salina bank, and later paid them. In this action the administrator sought to collect on these notes, but they were held to represent gifts, and there is no appeal from that ruling.

After the separation from his wife in 1906, William Hoard first lived for a few months at the home of his daughter, Mrs. Moorman; then for about a year he lived with his daughter, Mrs. Jones, at Salina. He then set up housekeeping in a residence situated on the South Santa Fe property. At first he had his sister, Mrs. Reynolds, as his housekeeper; later he employed the plaintiff in this action, then Mrs. Erickson. She was a widow and had three grown children; two of her daughters were married and lived in Salina. He conducted a boarding house and plaintiff did the cooking and housework. By this time he had bought the North Santa Fe property and was running a rooming house on the second floor. Plaintiff helped keep that. This continued until plaintiff and William Hoard were married. On December 10, 1914, they executed an antenuptial contract, which provided:

"Whereas, an immediate marriage is intended to be had between said parties of the first and second part, and each of said parties is fully informed as to what their right would be as husband and wife in the property of the other under the laws of the state of Kansas, and are desirous of settling in advance their property rights as to property now severally owned by them and as to all property they or either of them may hereafter acquire.

"Now, therefore, in consideration of said intended marriage and the promises, covenants and agreements contained herein, it is hereby covenanted and agreed that said William Hoard may and shall during the continuation of said marriage so intended, and after separation by death or otherwise, separately use, possess, mortgage, convey and dispose of all property of every kind and description and wherever situated and now belonging to him and all property which he may hereafter acquire and own, and all the rents, issues and profits thereof, to whomsoever he may choose and in whatsoever manner he may desire, in the same manner and to the same extent as he now can or then could have done had such marriage not taken place; and it is further agreed that he may sell and convey said property by deed, will or otherwise without the further consent or act of the party of the second part, and party of the second part hereby releases all interest therein and waives all right to inherit, have or take any part or portion of said property to the same extent as if said marriage had not taken place; and for the consideration aforesaid, it is hereby covenanted and agreed that said Isabella Erickson may and shall during the continuance of said marriage so intended, and after separation by death or otherwise, separately use, possess, mortgage, convey and dispose of all property of every kind and description and wherever situated now belonging to her, and all property which she may hereafter acquire and own, and all the rents, issues and profits thereof, in the same manner and to the same

extent as she now can or then could have done had said marriage not taken place; and it is further agreed that she may sell and convey said property by deed, will or otherwise without the further consent or act of the party of the first part, and the party of the first part hereby releases all interest therein and waives all right to inherit, have or take any part or portion of said property to the same extent as if said marriage had not taken place. Each of said parties here agree that the survivor thereof may not sue for, claim or demand any right or interest whatsoever in or out of any property of any kind or description of which the deceased may have died seized and to which he or she may have otherwise been entitled but for the provisions of this contract. And it is hereby mutually and expressly agreed and understood and consented to by and between the said parties and by each of them for themselves, their heirs, executors, administrators and assigns, that either of the said parties may bequeath or devise away from the other all his or her property and the consent of the other so to do is hereby given in the presence of the undersigned witnesses, and said parties further agree each with the other that during their joint lives they or either of them will at any time, on request, join the other in the execution of any conveyance of any real estate of which he or she may be seized or in any wise interested and make a formal release of all interest therein. By this agreement it is fully understood and intended that each of said parties shall have full power, authority and control over his or her own property whether now owned or hereafter acquired, in all respects to the same extent as if said marriage had not taken place, and that the covenants and agreements set forth herein shall bind said parties, their heirs, administrators and assigns. It is further agreed that no rescission, revocation or modification of this contract shall be binding upon said parties or either of them or upon the heirs, executors, administrators and assigns of them or either of them, unless such rescission, revocation or modification is in writing and signed by both first and second parties; and further that no evidence of any such rescission, revocation or modification shall be received in any court unless shown by such writing."

This was executed in the presence of two witnesses and acknowledged before a notary public. The parties were married within a day or two after executing this contract. At the time of the marriage William Hoard was the owner of the North Santa Fe property, then worth about $15,000, and the South Santa Fe property, then worth about $8,000, but encumbered for $2,000. This South Santa Fe property at that time consisted of parts of two fifty-foot lots, having a seventy-five-foot frontage, on the north thirty-four feet of which was a building extending from the street to the alley and rented for a garage, and on the south forty-one feet was a residence, where Mr. Hoard and his wife lived. Plaintiff then owned two small properties in Salina, worth about $1,750, and a note for $1,000 which Mr. Hoard had given her for services, and which he later paid. After the marriage, and on December 14, 1914, William

Hoard and his wife, the plaintiff herein, for a recited consideration of one dollar and love and affection, executed a deed to "Mary B. Jones and her living issue, . . . subject to the reservations hereinafter contained, unto said Mary B. Jones for and during her natural life and in fee to the issue of her body living at her death and their heirs and assigns," for that part of the South Santa Fe property then occupied by the garage; "the grantor, William Hoard, reserves the use, control and income of said real estate for and during his natural life and agrees to pay all taxes to be assessed thereon during said period," and containing the usual covenants of a general warranty deed. And on the same day William Hoard and his wife, the plaintiff herein, executed a deed to Verbia A. Moorman for the North Santa Fe property, but the terms of this deed are not shown by the record. It may be noted that neither of these deeds described the residence property then occupied by the parties as a home. The parties kept no boarders after their marriage, but continued to live in the residence on the South Santa Fe property for about a year, when they moved into the rooms on the second floor of the North Santa Fe property, where they continued to live until Mr. Hoard's death. Soon after moving from the South Santa Fe property the residence thereon was sold and moved off the lot, and another garage, extending from the street to the alley, was built on the forty-one-foot front. On October 4, 1916, William Hoard and his wife, the plaintiff herein, for a recited consideration of one dollar and love and affection, executed a deed to "Verbia A. Moorman, and her issue, . . . subject to the reservations hereinafter contained, unto Verbia A. Moorman for and during her natural life and in fee to the issue of her body living at her death and their heirs and assigns," for the North Santa Fe property, "the grantor, William Hoard, reserves the use, control and income of said real estate for and during his natural life and agrees to pay all taxes to be assessed thereon during said period," and containing the usual covenants of a general warranty deed.

In 1919 William Hoard bought the Walnut street property for $3,000 from a Mrs. Osborne. To convey the same she executed two deeds, one for each of the residences thereon, leaving the names of the grantees blank. These deeds had not been recorded at the time of Mr. Hoard's death, and were found in his safety deposit box at the bank. When found, the name Mary Belle Jones appeared as grantee in one of them and Verbia Ann Moorman as grantee in the

other, these names having been written in with a pencil and in the handwriting of William Hoard. After buying this property Mr. Hoard remodeled the houses thereon and otherwise improved it at an expense of about $3,500.

William Hoard had possession during his lifetime of all the property in controversy, and received the rents and paid the taxes and insurance thereon.

William Hoard died suddenly December 13, 1922. Soon thereafter the plaintiff moved into one of her residence properties from the North Santa Fe property, and Mrs. Moorman took possession of it and collected the rents, claiming the right to do so by virtue of the deed to her and her issue of October 4, 1916, and Mrs. Jones likewise took possession of the north garage building of the South Santa Fe property and collected the rents, claiming the right to do so by virtue of the deed of December 14, 1914, to her and her issue. This change of possession was made without objection from anyone. An administrator was appointed, and he, as agent for the heirs, collected the rents on the south garage building of the South Santa Fe property. Because of uncertainty as to who owned the Walnut street property, a person was agreed upon to collect the rents pending the determination of that question.

Plaintiff filed this suit for the partition of the South Santa Fe avenue property and the Walnut street property. The plaintiff claimed no interest, either at the time of the bringing of the suit nor at any time, in the North Santa Fe property, and she was given no share of that property in the final judgment. The answer of Verbia A. Moorman admitted that William Hoard, at the time of his death, was the owner of the south garage property on South Santa Fe avenue, which had not been conveyed, set up an ownership in herself to the one residence property on Walnut street, and denied it was subject to partition, and further denied the claim of the plaintiff to any share in any of the real property of William Hoard by reason of the antenuptial agreement, which, the answer averred, contained mutual promises that the respective estates of the parties should remain forever separate and upon the death of either party should pass to his or her children and the survivor would inherit no part of it; and further averred that the contract contained the provision that if the parties should live together for a period of five years, William Hoard should pay to the plaintiff the sum of $1,000; that the parties had lived together for more than five years, and that

William Hoard had paid to plaintiff the sum agreed. Plaintiff, in her reply to this answer, denied, under oath, the execution of the antenuptial agreement, as set forth in the answer; and as to the residence property on Walnut street to which Verbia A. Moorman claimed title, it was averred that William Hoard had never delivered the deed for the same to Verbia A. Moorman or parted with the possession of the real estate.

In the separate answer of Mary B. Jones and her children to plaintiff's petition, the death of William Hoard and the relation of the parties was admitted. It was further admitted that at the time of his death he was the owner of the south garage property on South Santa Fe avenue and that the same was subject to partition. It denied that plaintiff was entitled to any share in the partition of the property of William Hoard because of the antenuptial agreement, which was alleged, in substance, as in the answer of Mrs. Moorman. These defendants claimed full title to the north garage property on South Santa Fe avenue by virtue of the deed of December 14, 1914, and also claimed title to the one residence property on Walnut street. Plaintiff, in her reply to this answer, denied, under oath, the execution of the deed of December 14, 1914, and the antenuptial contract, and averred that if she signed the deed mentioned, that her signature thereto was obtained surreptitiously, and that she attached her name to the instrument inadvertently and without any notice or knowledge that it was a deed of conveyance to the real property described; that she never knowingly consented to or joined in the conveyance of such real property, and further averred that the deed was never delivered, but remained in the possession of William Hoard until his death; and as to the residence property on Walnut street, it was alleged that William Hoard bought this property and paid for it, that he went in possession of it, received the income and paid the taxes thereon until his death, and that a short time before his death, with intent to deprive plaintiff of her interest as a wife therein, and to deprive her of her right of inheritance in such real property, the said William Hoard wrote the name of defendant in the deed, but that the deed had never been delivered to the alleged grantee.

Defendants C. W. Hoard and Wilma Hoard joined in a separate answer and cross petition in which they admitted the death of William Hoard and the relationship of parties, and that at the time of

10—119 Kan.

his death he was the owner of the real property described in the petition, and that the same was subject to partition. They also plead the antenuptial agreement by which plaintiff was to have no interest in the property. The answer further avers that on October 4, 1916, William Hoard was the owner of the North Santa Fe property, on which date, without any consideration other than love and affection, and by way of advancement to her, he attempted to convey the same to the defendant, Verbia A. Moorman; that these answering defendants are informed and believe that the deed was never delivered prior to the death of William Hoard, and averred that by its terms it was null and void and did not convey any real estate to the grantee, and further averred that if such deed was delivered it was delivered by way of advancement. Similar allegations are made as to the deed to Mary B. Jones and her issue of December 14, 1914, for the north garage of the South Santa Fe avenue property. It was further averred that William Hoard purchased the Walnut street property in June, 1919, and caused to be executed by the grantor two deeds, one purporting to convey a portion of the property to the defendant, Verbia A. Moorman, and the other purporting to convey the remainder of the property to Mary B. Jones. These defendants aver, on information and belief, that the deeds were never delivered to the grantees therein named prior to the death of the grantor, that each of them remained in the possession of William Hoard, deceased, and that neither of them ever took effect, and that if the deeds were delivered. it was averred they were intended by William Hoard to be an advancement to the grantees named therein. It will be noted this is the first pleading seeking to partition the North Santa Fe property. The averments relating thereto were put in issue by proper pleadings. Plaintiff replied to this answer and cross petition, denied under oath the execution of the antenuptial agreement, and with reference to the deed to Mrs. Jones for a portion of the South Santa Fe avenue property and to Mrs. Jones and Mrs. Moorman for the Walnut street property, repeated her pleas in reply to the answers of those defendants.

At the time of the filing of the respective answers none of the defendants had a copy of the antenuptial agreement referred to in the answers. Shortly before the time for trial the antenuptial agreement was found by the administrator of William Hoard among his papers. The defendants, Verbia A. Moorman and Mary B. Jones,

each filed amendments to their answers, setting up a copy of this antenuptial agreement. It differed from the agreement as alleged in the original answers of these defendants in that it contained no provision that if the plaintiff should live with William Hoard for five years he would pay her the sum of $1,000. In other respects it is as was pleaded.

Thereafter, and before the trial, plaintiff, by permission of court, filed an amendment to the reply of plaintiff to the answers and cross petitions of the defendants, in which it is admitted that she attached her signature to the antenuptial contract, but avers that she did not read it, that it was not read to her, and she was not informed of its contents; that William Hoard at the time he presented the instrument to her for her signature falsely stated and represented that it was an agreement only reserving to himself the property he then owned, and that said instrument, in substance, provided that she should have a wife's share in all property which he should thereafter acquire, and that she should have the right, at his death, to take and inherit one-half of all the property which he thereafter might accumulate; that William Hoard willfully concealed from her the nature and effect of the instrument, and plaintiff, relying upon these statements, representations and assurances, executed the same. Plaintiff further averred that on October 4, 1916, it was mutually and orally agreed between plaintiff and William Hoard that the antenuptial agreement should be, and the same was then, wholly revoked, and that William Hoard then promised her that if she would sign the deed of that date to Verbia A. Moorman for the North Santa Fe avenue property he would at once destroy the antenuptial agreement, and that, relying upon such revocation and at his request, she thereupon joined in such deed, and that thereafter repeatedly her husband assured her that he had destroyed the antenuptial agreement, and that it was no longer in force. It is further averred that at the time she signed the agreement she had three children by a former marriage, that her property was of little value, that she was then forty-five years of age, that William Hoard was then seventy years of age and the owner of an estate of $20,000 in value, and that she signed the contract without the aid or the advice of an attorney as to its meaning or effect and wholly by reason of the deception practiced upon her, and she averred that the agreement to which her signature was obtained was at all times unfair.

Appellants complain of the ruling of the trial court allowing the plaintiff to amend her reply, contending that it changed the issues. A trial court has such discretion in the matter of amendment of pleadings before trial that it is difficult to predicate error upon the ruling. (21 R. C. L. 572 *et seq.*) This is especially true as to answers and replies. (31 Cyc. 424-456.) Here, because of the amended answers of the defendants Moorman and Jones setting out a correct copy of the antenuptial agreement, which differed in at least one material respect from the allegations concerning it in their original answers, that plaintiff was entitled to reply. The reply is one which could have been made had the antenuptial agreement been correctly pleaded in the original answer. The fact that the plaintiff denied the execution of an alleged antenuptial agreement, said to contain material allegations not in the agreement actually signed, ought not to prevent her from admitting the execution of the agreement which actually was signed, and pleading matters which avoided its force and effect. See *Gordon v. Munn,* 87 Kan. 624, 125 Pac. 1. It is true the answer of the appellees C. W. Hoard and Wilma Hoard did not incorrectly state the contents, in substance, of the antenuptial agreement, but they did not complain of the filing of the amended reply, and make no contention now upon that point. This is a matter which addresses itself to the discretion of the trial court rather than to the legal question of the power of the court. It was better to have the agreement in the pleadings than allegations concerning its contents, which would be difficult or impossible to prove. Hence it was proper to allow the amendment to the answers. After a correct copy of the antenuptial agreement was set forth, any plea the plaintiff had to make to that specific agreement was competent, and we cannot say that the court abused his discretion in permitting it to be filed.

Upon the issue joined, as to whether plaintiff was induced by fraud to execute the antenuptial agreement, the jury found that no fraud was practiced upon plaintiff at the office or place where she executed the antenuptial agreement to induce her execution thereof, and this finding was approved by the court. It is sustained by the evidence. The jury also found that William Hoard, by his statements and conduct, did not mislead the plaintiff as to the contents of the antenuptial contract submitted for her signature. The court set aside this finding and found that before their marriage it was orally agreed between them that William Hoard should retain for

his own children the property he then possessed and that plaintiff should not have any right to or interest in any of it, and that the plaintiff, in the event that she survived, should have a wife's share in all the property acquired by him after the proposed marriage, and that it was further agreed that plaintiff should retain for herself and her children all the property she then possessed, and that he should not have any right to or interest in any of her property; that plaintiff relied upon this agreement when she married William Hoard, and that the agreement was made in consideration of the proposed marriage, and further found that by his conduct William Hoard misled the plaintiff as to the nature and effect of the contract which he caused to be submitted to her for execution, and that he caused plaintiff to sustain the belief that it contained nothing inconsistent with her oral agreement respecting plaintiff's rights in and to his property if she became his wife, and that he concealed from plaintiff the true nature and effect of the contract and was guilty of bad faith in procuring plaintiff's execution thereof.

Appellants complain of the ruling of the court setting aside the finding of the jury and of the findings made in this respect by the court, and contend there was no competent evidence upon which the court could base such findings. This contention must be sustained. The testimony cited as supporting the court's finding is as follows: Mr. Finney, a son-in-law of plaintiff, who was at the Hoard residence the evening before the marriage, said Mr. Hoard told him of the contemplated marriage. "He also stated that he intended to have a contract made whereby the property which he had brought from the farm would be left to his children and she would receive a wife's share in what he made thereafter." And the testimony of Mrs. Oberfelt, a daughter of plaintiff, who was present on the same occasion, as to what Mr. Hoard said concerning the matter, is as follows:

"Well, he said that if they were divorced that she wasn't to share in the estate, but if they lived the rest of their lives together that he was to give to his children what he had brought from the farm, what he then had, and she was to receive a wife's share in what he made after.

"Q. Did he say anything about whether he would have such a contract prepared? A. Yes, sir; he expected to draw it up."

Mr. Henry Moorman, husband of Verbia A. Moorman, testified that on Christmas day, 1914, William Hoard and plaintiff took Christmas dinner at his house, and that Mr. Hoard told his wife in his hearing:

" 'Verbia,' he says, 'Mamie and I have got married.'

"Q. Is that the first you heard of the wedding? A. Yes, sir; and he 'went ahead and told. He says that, 'We have drawed up an agreement,' he says; 'all the property that I have got now,' he says, 'is, belongs to my children'; and then Mrs. Hoard spoke up and says to my wife, she says, 'Verbia,' she says, 'I don't want you to think that I am trying to get any of Mr. Hoard's property.' "

Mr. Hoard went to the office of his attorney, where the contract was prepared, and he signed it either there or in the adjoining office of a notary public. Later in the same day the plaintiff went alone to the office of the notary public and signed the contract. Their signatures were witnessed by a person called in. The notary testified that it was his habit to read such documents to persons, but he had no distinct recollection as to whether he did in this case. Plaintiff testified that she did not read it; in fact, that she could not read, and that it was not read nor explained to her.

Analyzing this evidence, it is clear that it does not support the finding of the court that the specific parol contract stated in the finding was made by the parties. The statement to Mr. Finney and to Mrs. Obervelt was no more than a general statement as to Mr. Hoard's intention. It does not purport to give the substance of the contract actually made and agreed upon by the parties, and the statement made by William Hoard and the plaintiff at the Moorman home on Christmas day, considered as a whole, is not inconsistent with the contract as signed. The facts that the plaintiff was unable to read, or that it is not affirmatively shown that the contract was read to her at the time she executed it, do not in themselves indicate fraud (*Burns v. Spiker,* 109 Kan. 22, 202 Pac. 370), its voluntary execution being admitted. While good faith should always characterize the preparation and execution of marriage contracts, they are not only recognized, but favored by the law (*Hafer v. Hafer,* 33 Kan. 449, 6 Pac. 537; *Matney v. Linn,* 59 Kan. 613, 54 Pac. 688; *King v. Mollohan,* 61 Kan. 683, 60 Pac. 731; *Casey v. Casey,* 84 Kan. 380, 113 Pac. 1047; *Henry v. Butler,* 87 Kan. 122, 123 Pac. 742; *Watson v. Watson,* 104 Kan. 578, 180 Pac. 242, 182 Pac. 643), when fairly and intelligently made, and when just and equitable in their provisions. In this case the plaintiff undertook, and to an extent was permitted, to testify as to her understanding of the contract to be made. She was not a competent witness to testify as to any agreement or understanding with her intended husband on that matter (R. S. 60-2804), and any evidence of that

character which was admitted should not have been considered by the court. (*Hafer v. Hafer*, 33 Kan. 449, 463, 6 Pac. 537; *Allen v. Allen*, 108 Kan. 765, 769, 196 Pac. 1075; *Knights of Pythias v. Ferrell*, 83 Kan. 491, 496, 112 Pac. 155; *Dennis v. Perkins*, 88 Kan. 428, 437, 129 Pac. 165; *Eberhart v. Rath*, 89 Kan. 329, 337, 131 Pac. 604.) Even if it were considered, and in connection with the evidence above stated, it is insufficient to support the court's finding. (*Robinson's Estate*, 222 Pa. St. 113.) There must be some force and effect given to written contracts voluntarily executed. They should not be lightly set aside. (*Buchanan v. Gibbs*, 26 Kan. 277; *Ferguson v. Nuttleman*, 110 Kan. 718, 205 Pac. 365.) When written instruments affecting property rights have been voluntarily executed and the lips of one of the parties to it have been sealed by death, for the other party to say that his understanding was that it should have contained different language or a different clause which is much more advantageous, financially, to such party than the contract itself, is wholly insufficient to sustain such claim; and for written contracts to be in effect nullified by a statement made to some third person by one of the parties as to the kind of contract he intended to make, which third person was not present at the making of any contract, either oral or written, is entirely inadequate to base a judgment setting aside the contract on the ground of fraud which induced its execution. (26 C. J. 1093.)

Upon the issues joined as to whether the antenuptial agreement was revoked, the court found it was revoked by the parol agreement of the parties on October 4, 1916. The evidence pertaining to that is as follows: On October 3, 1916, William Hoard had a slight paralytic stroke which somewhat affected his speech but did not seriously incapacitate him otherwise. Because of it, however, the plaintiff sent for her children, who were in Salina, and they were at the Hoard home on October 4. Soon after noon Mr. and Mrs. Hoard dressed to go out on the street. Mr. Finney asked them where they were going. "Mr. Hoard said he had been over to the bank in the forenoon and they told him that the deed which mother signed two years previous to that, conveying this brick building to his daughter Verbia, was no good, also the contract was no good, and he wished to make it right, and as he wished his daughter Verbia to have the building, he also said if mother agreed to sign a new deed, a deed that would be good to Verbia, he would destroy the contract, because he wished his wife to receive a wife's share in the balance of

his estate." Mrs. Hoard signified her consent to this proposition. Mrs. Obervelt was there on the same occasion·and heard the talk about the matter.

"Q. What, if anything, did Hoard say at that time? A. Well, when I went up there they were ready to go out on the street. He said they had a little business to attend to, and he said he had discovered that the deed he had for Mrs. Moorman wasn't any good and he was going to make out a new one; he wanted mother to go and sign this deed, and he said if she would sign this deed that he would destroy the contract that he held against her, and she was to come in then a wife's share of the rest of the property."

Mrs. Hoard assented to that. · Mr. Hoard said he would get the contract and destroy it. There was further evidence that he stated on several occasions thereafter that he had destroyed the contract. It seems that the contract was not destroyed, for it was found among Mr. Hoard's papers after his death. But if there was a valid agreement to revoke the antenuptial agreement, the fact that the document itself was not destroyed would not be material. (*Gordon v. Munn,* 87 Kan. 624, 639, 125 Pac. 1.) Appellants contend there was no consideration for the agreement of revocation, if one were made; that by the terms of the antenuptial agreement, either as it reads, or even as she said she understood it to be, Mrs. Hoard had obligated herself to join Mr. Hoard in any conveyance he desired to make of property owned by him at the time of the marriage, which would include this property, and that the deed then executed was only for the purpose of making valid a conveyance attempted by a former deed. Ordinarily the mutual agreement of the parties is sufficient consideration for revoking an antenuptial agreement. In this state there is no legal inhibition upon contracts between husband and wife which are fairly made and reasonable in their terms. (*King v. Mollohan,* 61 Kan. 683, 60 Pac. 731; *Eberhardt v. Rath,* 89 Kan. 329, 131 Pac. 604.) But considering, as argued by appellants, that the agreement to revoke was conditioned upon the wife signing the deed, it would not be lacking a consideration. At that time the parties were living in the property to be conveyed; it was their house. The homestead rights of the wife, provided for by our constitution (art. 15, § 9) and statutes (R. S. 22-101), cannot be affected by an antenuptial agreement (*Hafer v. Hafer,* 36 Kan. 524, 13 Pac. 821; *Matney v. Linn,* 59 Kan. 613, 54 Pac. 688; *Watson v. Watson,* 106 Kan. 693, 189 Pac. 949; 107 Kan. 193, 191 Pac. 482); but would be affected, of course, by a valid deed which she would voluntarily execute. (*Burns v. Spiker,* 109 Kan. 22, 30, 202 Pac.

370.)   The former deed to this property was invalid, for some undisclosed reason, as the parties were then informed and believed; the antenuptial agreement did not obligate her to execute a deed to her homestead; hence if she agreed to execute a valid deed to such property, and did so, it was sufficient consideration to support the agreement to revoke the antenuptial agreement.

Appellants argue that the evidence upon this question, and the court's finding, show, if anything, a modification of the antenuptial agreement as distinct from a revocation of it. The court's finding is as follows:

"In October, 1916, the plaintiff and her husband, Wm. Hoard, occupied as a home the real estate on North Santa Fe avenue, in Salina, Kan., described in the Moorman deed, and said Hoard then proposed to plaintiff, in substance, that if she would join with him in a deed to his daughter, Mrs. Moorman, for such property, the plaintiff should have a wife's share in the remainder of his property at his death and that he would destroy the agreement which she had signed before their marriage. The plaintiff assented to such proposal, and relying upon the promises of her husband she signed the deed mentioned in the findings to Mrs. Moorman for the property then occupied by them as a home."

Perhaps the court, by the phrase "the plaintiff should have a wife's share in the remainder of his property," as used in the finding, meant no more than the ordinary result which would naturally follow from a revocation of the antenuptial agreement, and we interpret that to be the meaning. Antenuptial agreements are governed as to their execution (*Brown v. Weld*, 5 Kan. App. 341) by the statute of frauds (R. S. 33-106), and to be enforceable by action must be in writing (*Breen v. Davies*, 99 Kan. 110, 160 Pac. 997), unless fully performed. (*Weld v. Weld*, 71 Kan. 622, 81 Pac. 183.) A modification of a contract is in legal effect a new contract, and when by reason of the statute of frauds the original contract must be in writing to be enforceable, a modification thereof, to be enforceable, must be in writing. (*Banister v. Fallis*, 85 Kan. 320, 116 Pac. 822; *Autem v. Coal Co.*, 98 Kan. 379, 158 Pac. 13.) This is not true with a revocation. The statute of frauds applies to the making of enforceable contracts, not to their revocation; hence, though the original contract must be in writing to be enforceable under the statute of frauds, an absolute revocation of such a contract may be by parol. (*Ely v. Jones*, 101 Kan. 572, 168 Pac. 1102.) Hence, if the quoted clause in the court's finding does not mean the ordinary consequences of the revocation of the antenuptial agreement, and is intended to mean that such agreement is in some way

enlarged or modified, it is to that extent unenforceable. Construing the court's finding as we do, it is not without evidence to support it and will not be disturbed.

The provision in the antenuptial agreement that it can be modified or rescinded only in writing would not prevent the parties from revoking it or from making a new contract.

"There can be no more force in an agreement in writing not to agree by parol than in a parol agreement not to agree in writing, and every agreement of that kind is ended by a new one which contradicts it." (6 R. C. L. 915.)

The appellant, Mrs. Moorman, complains of the finding and judgment of the court refusing to give force and effect to the deed for the North Santa Fe property, dated October 4, 1916, executed by William Hoard and his wife, the plaintiff herein, to Verbia A. Moorman and her issue, and directing partition of this property among the four children of William Hoard in equal shares. The only issue upon this question is whether the deed was delivered, and this issue arises only between the appellant, Mrs. Moorman, and the defendants, Wilma Hoard and C. W. Hoard. The plaintiff claimed no interest in this property and was given none, and the defendants, Mary B. Jones and her issue, made no claim to any interest therein. The evidence pertaining to the execution and delivery of this deed is substantially as follows: William Hoard bought this property in 1906, soon after his separation from his first wife and before their settlement and divorce. At that time he took a deed from the purchaser to his daughter, Mrs. Moorman, as grantee, but this deed was not recorded at once. After his divorce from his first wife, and in 1910, Mrs. Moorman and her husband executed a deed to William Hoard for this property, and the deed to Mrs. Moorman and the deed from her and her husband to William Hoard were recorded on the same day. On December 14, 1914, just a few days after the marriage of William Hoard and plaintiff, they executed a deed of some kind for this property to Mrs. Moorman. The terms of that deed are not shown by the record; no one is relying upon it here; it is simply mentioned as a part of the history of the transaction concerning the matter. About the first of October, 1916, William Hoard had a slight paralytic stroke which affected his speech somewhat, but did not incapacitate him otherwise. About that time, in talking with his banker about his business, which it appears he did upon occasions, he was informed that the deed for this property to Mrs. Moorman of December 14, 1914, was invalid, for some reason

which is not disclosed by the record. On learning this he told his wife, the present plaintiff, about it and said that he wanted to make a new deed to Mrs. Moorman that would be good, for he wanted her to have that property. The plaintiff consented to execute such a deed. William Hoard kept the deed in his pocket or about the house for some time. On one occasion it was misplaced; Mr. Finney found it and gave it to him, and he then said he "was going over and rent Mrs. Moorman a box before he did lose it."

The relations between Mrs. Moorman and her family and that of William Hoard and plaintiff were most congenial. They visited back and forth and when any of the Moorman family came to Salina they usually visited at the Hoard residence, and Mr. Hoard and his wife frequently visited at the home of the Moorman's in the country. Mrs. Moorman was blind, and had been entirely without the sight of her eyes since about 1905. She is the mother of seven children. The plaintiff and her daughter who lived in Salina, and her son-in-law, Mr. Finney, knew that the purpose of Mr. Hoard was that this North Santa Fe avenue property should go to Mrs. Moorman and her issue, in accordance with the terms of this deed, and all of them acquiesced in it. In talking of his business affairs with Mr. Fred H. Quincy, with whom he.had done his banking business for many years, he stated on more than one occasion that this property was to go to his blind daughter, Mrs. Moorman, and that he had fixed it so it would go to her; that he had made her a deed to it, and used similar expressions.

On May 23, 1917, William Hoard met his daughter, Mrs. Moorman, near the Planters State Bank in Salina. Mrs. Moorman was then accompanied by her daughter, Velma Moorman. Mr. Hoard asked Mrs. Moorman to go into the bank with him. He there rented a safety deposit box, No. 329, in the name of Verbia A. Moorman, and paid the rent on it for one year, was given a receipt for the rent in the name of Verbia A. Moorman, which receipt he gave to her; was given two keys for the box, went back into the bank vault with her, showed her where the box was, gave her one of the keys, and showed her how to operate it to lock or unlock the box, and told her that he was putting in the box two deeds, one to her for the North Santa Fe property and one for Mrs. Jones, and told her to keep the one of them, and to give the other one to Mary B. Jones at his death. Mrs. Moorman continued to have this box at the bank until after William Hoard's death, and paid the rent on it each year after the first year.

There is no intimation in the evidence that William Hoard ever changed his mind about wanting his daughter, Mrs. Moorman, to have this property, or that he ever sought or intended to recall this deed or take it out of the box, or assume any control over it. He did continue to occupy the property, collect the rents and pay the taxes and insurance thereon as long as he lived. After his death this deed was recorded. There is a contention about whether the deed was taken from this box or from another after Mr. Hoard's death. In September, 1921, Velma Moorman, a daughter of Mrs. Moorman, who at that time was working in Salina, rented a safety deposit box at the same bank, No. 363. There is evidence that a few months prior thereto Mrs. Moorman had taken both the deeds, the one to her and the one to Mrs. Jones, out of her box at the bank and that they were put into Velma's box at the time she rented it, and remained there until after the death of Mr. Hoard; there were circumstances tending to show that the deed was taken out of Mrs. Moorman's box, No. 329, after the death of Mr. Hoard, and the court so found. As we view the record, it is not material from which box it was taken. The court, in reaching the conclusion the deed had not been delivered, placed much stress upon the fact that William Hoard continued to use and occupy the premises during his life, and received the rents and paid the taxes and insurance thereon. In view of the fact that by the specific terms of the deed he reserved the use and income of the property during his life and agreed to pay the taxes thereon, no force should have been given to that circumstance. This should have been given the opposite construction from that placed upon it by the court. The rule of law is that in deed of gifts to children or relatives, the reservation by the grantor of the use of the property during his lifetime is evidence of an intention to deliver the instrument before his death, for there could be no purpose in placing such a reservation in the deed if it were not delivered in his lifetime. (*Young v. McWilliams*, 75 Kan. 243, 250, 89 Pac. 12, and cases there cited; *Zeitlow v. Zeitlow*, 84 Kan. 713, 717, 115 Pac. 573.)

While the matter of paying insurance is not mentioned in the deed, one who has a life use of property has an insurable interest therein (26 C. J. 34), and his payment of insurance was not in contravention of the deed. The court also laid much stress upon the fact that William Hoard retained a key to this box, and evidently reached the conclusion from that circumstance alone that he did not intend to

part with the possession of the deed. This view is obviously erroneous. William Hoard had a safety deposit box at the bank rented in his own name in which he kept many of his papers, and could have placed this deed in that box had it been his purpose to retain possession of it. He did place it in Mrs. Moorman's box, to which she had a key, which he instructed her how to use, and by doing so he placed it in her possession. She could then leave it there or take it out and put it some other place, or even record it, and he was powerless to prevent it.

"Where the manual delivery is relied upon, the conclusive test is whether the grantor relinquished the right to the immediate control of the deed." (*Elliott v. Hoffhine,* 97 Kan. 26, 28, 154 Pac. 225.)

Hence the question whether she did leave it in that box until after his death and get it from there and record it, or whether she took it out of that box a year or more before and kept it some other place, is not important. There was a complete manual delivery of the deed to her when he placed it in her box, and there is no evidence tending to show that he intended anything else than that she should have complete possession of it.

Since October, 1921, the employees of the bank kept a record of the opening of safety deposit boxes. This record showed box No. 329 was opened but once, on December 28, 1921, between that date and the death of Mr. Hoard. When the box was opened after his death its only contents (barring the controversy above mentioned as to whether the deeds were there) were life insurance policies of two of Mrs. Moorman's children, in which she was named as beneficiary, and a lease executed by William Hoard to tenants for the first floor of the North Santa Fe property, dated October 2, 1920, and running for ten years. So if William Hoard ever opened box No. 329, after it was first rented in May, 1917, there is nothing to indicate that he did so for any other purpose than to place therein this lease, that Mrs. Moorman might have it in the event of his death before it expired.

In *Rohr v. Alexander,* 57 Kan. 381, 46 Pac. 699, it was said:

"The possession by a grantee of a deed, purporting to convey real estate, duly executed and acknowledged, and which is absolute in form is *prima facie* evidence of a delivery which can be overthrown only by clear and convincing evidence." (Syl. ¶ 1.)

And on page 384 it was said:

"The possession of the deed being *prima facie* evidence of its delivery, the

burden is thrown upon a party who questions the delivery. The presumption . . . is not overcome by the statements made by Rohr prior to the making of the deed, nor by the fact that it remained unrecorded until after his death."

In *Malaney v. Cameron*, 98 Kan. 620, 159 Pac. 19, it was said:

"The presumption of delivery arising from the possession of a deed by a grantee arises even in the absence of evidence that such possession was obtained prior to the death of the grantor." (Syl. ¶ 3.)

The appellant, Mrs. Moorman, complains of the refusal of the court to give instructions requested, and of instructions given. It would unduly lengthen this opinion to set out and analyze the instructions, and we regard it as unnecessary, since the jury was used in an advisory capacity only and the instructions are important chiefly as showing the views of the court as to the law of the case. It is sufficient to say that in passing upon instructions requested and in giving instructions the court did not follow the previous decisions of this court in cases heretofore cited. The jury was not properly instructed upon whom was the burden of proof as between this appellant and defendants contending there was no delivery, nor upon the presumption of delivery arising from the form of the deed, or from its possession by the grantee. By the lack of proper instructions, as bearing upon the delivery of the deed, of the possession of the property by William Hoard during his lifetime, and by submitting questions pertaining thereto to the jury, this was made a prominent feature of the case, when it should have been eliminated entirely. In the first place, there was no controversy about that question; and in the second place, the deed reserved in him the use and income of the property during his life and obligated him to pay the taxes thereon; hence the fact that he did have possession and pay the taxes and insurance had no bearing whatever upon the question sought to be controverted, viz., the delivery of the deed.

Ordinarily the question of the delivery of a deed is one of fact to be determined by the jury or trial court from all the evidence pertaining to that matter (*Zeitlow v. Zeitlow*, 84 Kan. 713, 715, 115 Pac. 573; *Stumpff v. Kaechler*, 95 Kan. 106, 147 Pac. 821; *Donaldson v. Brewer*, 103 Kan. 690, 175 Pac. 968); but where the facts are not controverted it is a question of law to be determined by the court. (*Worth v. Butler*, 83 Kan. 513, 112 Pac. 111.) Here the evidence pertaining to the making and delivery of this deed is not controverted. When Mr. Hoard and plaintiff were married it was the agreement between them that the property he then owned should

go to his children at his death; and this is true whether we take the antenuptial agreement as written or plaintiff's present version of her understanding of it. A few days after their marriage they executed a deed for the North Santa Fe property to Mrs. Moorman. Nearly two years later, on being informed that deed was invalid, he had his wife join him in making a new deed, the one in controversy. He wanted to make a deed "that would be good to Verbia," and in order to have that done he made an agreement with his wife that if she would join in such a deed he would revoke their antenuptial agreement. The plaintiff consented to this and the deed was executed, and she has never since then contended that the deed then made was not good nor that it was not later delivered. Some months later Mr. Hoard misplaced the deed, and when it was found and returned to him he expressed his purpose of renting a box for Mrs. Moorman before he did lose it. In May, 1917, he did rent a box for Mrs. Moorman, gave her a key to it and taught her how to use it, placed the deed in the box, told her what it was and for her to keep it. She did keep it—whether all the time in that box, or part of the time at some other place, is not material—and after his death she recorded it. These uncontroverted facts show a valid conveyance and a delivery of the deed during the lifetime of the grantor, as a matter of law. The fact that Mr. Hoard retained a key to Mrs. Moorman's box would not negative the delivery of the deed to her, in the absence of a showing that he retained the key in order to retain possession of the deed. The burden was upon appellees to make such showing. He might have retained the key for a purpose entirely consistent with his having delivered the deed.

The appellants, Mary B. Jones and her issue, complain of the findings and judgment of the court refusing to give force and effect to the deed to them of the north garage of the South Santa Fe property, dated December 14, 1914, executed by William Hoard and his wife, the plaintiff herein, and directing the partition of this property, one-half to plaintiff and one-eighth to each of the four children of William Hoard. As to this deed, the plaintiff denied its execution and averred that if she did execute it she did not do so knowingly, and both she and the defendants, Wilma Hoard and C. W. Hoard, contend it had never been delivered. As to its execution, the jury found that plaintiff executed it and that she knew and fully understood that she was signing a deed to a part of the South

Santa Fe property to Mary B. Jones and her issue. These findings were approved by the court and are sustained by the evidence.

The only other question respecting the validity of this deed is its delivery, and the evidence on that question is substantially as follows: After its execution William Hoard retained possession of it until May, 1917. At the time he rented the box for Mrs. Moorman in the Planters State Bank and had the receipt issued in her name and delivered to her, gave her a key and told her how to use it, he placed this deed in that box and told Mrs. Moorman to deliver it to his daughter, Mary B. Jones, after his death. On December 23, 1922, after the death of William Hoard, his heirs present had a meeting at the bank. There were present at this meeting the plaintiff, Mrs. Jones, Mrs. Moorman, C. W. Hoard, Mr. Moorman and Mr. Finney. The search through his box disclosed no will. While there, Velma Moorman's box, No. 363, was opened and this deed to Mrs. Jones and her issue was taken from it and handed to Mrs. Moorman, who there gave it to Mrs. Jones and told her, in substance, that it was a deed which her father had left with her with directions to deliver to Mrs. Jones after his death. Plaintiff's attention was called to the deed, and perhaps she admitted that her signature was upon it. Mrs. Jones spoke of having it recorded, and did send it for record. Neither the plaintiff nor anyone else present made any objection to this deed or the recording of it. It is contended this does not show a valid delivery of the deed, and the court so held. In doing so he laid stress upon the fact that William Hoard had possession of the property, receiving the rents and paying the taxes and insurance thereon during his lifetime. No force should have been given to that circumstance. Attention was also given to the fact that when William Hoard placed this deed in Verbia A. Moorman's box and gave her a key for it he retained a key to the box himself. In making their case these appellants offered to show by Mrs. Moorman that William Hoard stated at the time that his reason for retaining the key was that he might want to put something else in the box for her. This evidence was excluded, and these appellants complain of the ruling excluding that evidence. It was error to exclude it as to these appellants. So far as the Mary B. Jones deed was concerned, Mrs. Moorman was not an incompetent witness under R. S. 60-2804. Appellees contend that if this ruling was erroneous it would avail these appellants nothing, for the reason

Hoard v. Jones.

that it was not offered by affidavit or otherwise upon the motion for
a new trial. The affidavit of Mrs. Moorman was filed and consid-
ered by the court upon the motion for a new trial, but appellees
contend that it was filed in behalf of Mrs. Moorman and not in
behalf of Mrs. Jones. This is entirely too technical. The purpose
of this statute is for the court to have the sworn statement of a
witness to the testimony, and that was complied with by the affidavit
of Mrs. Moorman. No complaint is made about the delivery from
Mrs. Moorman to Mrs. Jones. The only real question is, Was
the instrument delivered to Mrs. Moorman, to be later by her de-
livered to Mrs. Jones, at the time it was placed in Mrs. Moorman's
box in May, 1917? The evidence concerning this matter, as above
set forth, is not controverted. This box was rented in the name
of and for Mrs. Moorman; she was given a key to and instructed
how to use it; this deed was placed in the box by William Hoard
with directions to Mrs. Moorman to deliver it to Mrs. Jones after
his death. Mrs. Moorman kept the deed—whether in that box or
some other place is not material—and delivered it to Mrs. Jones
after the death of William Hoard and in accordance with his di-
rections. We regard this as showing a delivery of the deed by
William Hoard to Mrs. Moorman, and by her to Mrs. Jones. (*Rust
v. Rutherford,* 95 Kan. 152, 147 Pac. 805; *Wuester v. Folin,* 60 Kan.
334, 56 Pac. 490; *Young v. McWilliams,* 75 Kan. 243, 89 Pac. 12;
*Harmon v. Bowers,* 78 Kan. 135, 96 Pac. 51; *Norton v. Collins,*
81 Kan. 33, 105 Pac. 26; *Elliott v. Hoffhine,* 97 Kan. 26, 154 Pac.
225.)

With this view we should not reverse the case for retrial because
of the error of excluding evidence favorable to these appellants,
but hold as a matter of law that the delivery was complete, as
shown by the evidence received.

The remaining important question in the case arises over the
two deeds to the Walnut street property. William Hoard purchased
this property from a Mrs. Osborne in 1919. She executed two
general warranty deeds. These contain no reservations of life
estates or similar limitations. They were on the ordinary printed
form, the blanks being filled in with a typewriter except as to the
name of the grantee. At some time between the date of the de-
livery of these deeds to William Hoard and his death he wrote in
pencil the name of Verbia Ann Moorman as a grantee in one of

them and Mary Belle Jones as grantee in the other. The deeds were not recorded during the lifetime of William Hoard and were found by the administrator in his safety-deposit box in the bank after his death. They were later recorded. So far as the record discloses, there is no substantial evidence that anyone other than William Hoard knew that he had written these names in the deeds as grantees. The court held that these deeds had never been delivered to the grantees named, that they were not effectual to pass title to them, and held the property subject to partition among the parties to the action, one-half to plaintiff and one-eighth each to the children of William Hoard. This ruling was correct. It is not contended Mrs. Osborne was trying to give this property to these appellants. As to them it is as though William Hoard had executed deeds in their favor, about which he said nothing to anyone, and kept them unrecorded among his private papers in his box, where they were found after his death. In such event they would pass no title to the grantees named. (*Burton v. Boyd,* 7 Kan. 17; *Lawn v. Donavan,* 2 Kan. App. 404. *Stone v. French,* 37 Kan. 145, 14 Pac. 530. *Worth v. Butler,* 83 Kan. 513, 112 Pac. 111. *Alward v. Lobingier,* 87 Kan. 106, 123 Pac. 867.)

When Mr. Hoard purchased this property and paid for it he became the equitable owner of it. (*Bank v. Fleming,* 63 Kan. 139, 65 Pac. 213.) He had such title as will pass by his deed. (*Klopf v. Klopf,* 113 Kan. 568, 215 Pac. 827.) But any conveyance he made, if his wife made no conveyance, would not defeat her right under the statute (R. S. 22-108) to a one-half interest therein at his death. The appellants, Mrs. Moorman and Mrs. Jones, contend that the deeds on their face indicate an intention to give these properties to the grantees named therein. It is clear, if that were Mr. Hoard's intention, he did not intend for the grantees named therein to have any title or interest in the property until his death. If this was a gift it was testamentary in its nature—that is, not to take effect until death—and not being executed as provided by the statute for the execution of wills, cannot be effective to pass title to the grantees named. It is argued by appellants that these deeds might be construed to be ineffectual to bar the widow's half interest in the property, but since they evidence a purpose for the grantees named to have the property they are effective for that purpose as against the other children of William Hoard. This

view disregards the testamentary nature of the intended gift, which is as effective in behalf of the other children as it is in behalf of the widow.

The appellees, Wilma Hoard and C. W. Hoard, contend that if for any reason this court should hold the deed to Mrs. Moorman for the North Santa Fe property and the deed to Mrs. Jones for the portion of the South Santa Fe property to be valid, they should be construed as advancements. The question of these deeds being advancements was raised by the issue in the case and submitted to the jury, and there were specific findings that they were not advancements, and these findings were approved by the court. It is suggested that these findings were made because the deeds were held not to be effectual to pass title, and if this court should now hold them to be valid, the question as to their advancements should be retried. An examination of the record discloses nothing tending to show that these deeds were advancements, or any reason for setting aside the findings of the jury and court upon that question.

In view of what has been said, the judgment of the court below will be modified in this respect, by reversing the judgment as to the deed dated October 4, 1916, to Verbia A. Moorman and her issue, and the deed to Mary B. Jones and her issue of December 14, 1914, with directions to enter judgment holding those deeds valid, and the property described in them not subject to partition in this action; and by affirming the judgment of the court below as to the partition of the remainder of the property.

BURCH, J., not sitting.